In re TOYOTA MOTOR CORP. UNINTENDED ACCELERATION MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION.

This document relates to:

Van Alfen et al.

v.

Toyota Motor Sales, U.S.A., Inc.

Nos. 8:10–ML–2151 JVS (FMO), CV 11–08120 JVS (FMO).

United States District Court, C.D. California.

June 11, 2012.

ORDER GRANTING IN PART AND
DENYING IN PART MOTION FOR
TERMINATING SANCTIONS

JAMES V. SELNA, District Judge.

Table of Contents

I. *Relief Sought by the Present Motion* ........................................ 488

II. *Factual Background* ........................................................ 489
 A. *The UHP Investigated the Fatal Van Alfen Collision* ...................... 489
 B. *Consent Regarding the Vehicle Inspection* .............................. 490
 C. *The November 19, 2010 Vehicle Inspection* .............................. 492
 1. *Inspection Reports* ............................................... 492
 a. *Dynamic Science, Inc., Report* .............................. 492
 b. *Toyota Report* ............................................. 493
 2. *Testimony Regarding Original Physical Inspection of Van Alfen Vehicle* ........................................................... 493
 3. *Expert Reports and Testimony* ..................................... 494
 a. *Reliability of EDR Download* ................................ 494
 i. *Mahon Declarations* ................................... 494
 ii. *Caruso Declaration and Testimony* ...................... 495
 iii. *Nunan Declarations* .................................... 495
 iv. *Shibata Declaration* .................................... 496
 b. *Broken Plastic Part* ........................................ 496
 i. *James Declaration* ..................................... 496
 ii. *Kitchen Declaration* ................................... 496
 iii. *Supplemental James Declaration* ........................ 497

III. *Duty to Preserve Evidence Generally and Applicability of the Preservation Order* ...................................................................... 497

IV. *Motions to Strike and/or Exclude Plaintiffs' Expert Declarations* ............ 498

V. *Sanctions* ................................................................ 499
 A. *Standards for Imposing Sanctions For Evidence Destruction or Alteration* .............................................................. 499
 B. *Bases for Imposing Sanctions in this Case* .............................. 500
 1. *EDR Data* ......................................................... 502
 2. *Broken Piece of Plastic* ........................................... 503

VI. *Conclusion* .............................................................. 504

This individual action, a member case of the multi-district litigation ("MDL") referenced above, arises out of a fatal auto collision involving Plaintiffs, Shirlene Van Alfen and Cameron Van Alfen[1] (mother and son), as well as decedent Paul Van Alfen (Shirlene's husband and Cameron's father) and decedent Charlene Lloyd (Cameron's fiancée). Decedent Paul Van Alfen was driving a 2008 Toyota Camry at the time of the colli-sion, which allegedly experienced an incident of sudden, unintended acceleration ("SUA"). (Compl. ¶ 33.)

Presently before the Court is a Motion filed by all Plaintiffs seeking relief against all four Defendants (collectively, "Toyota" or "the Toyota Defendants"). Specifically, on February 17, 2012, Plaintiffs filed their Motion for Terminating Sanctions, Evidentiary Sanctions or, in the Alternative, For an Ad-

---

**1.** For clarity, and when necessary, the Court at times refers to members of the Van Alfen family by their first names.

verse Inference Jury Instruction Against the Toyota Defendants for Violation of Preservation Order and Destruction and/or Alteration of Evidence. (MDL Docket No. 2389–1 to – 11.) Toyota filed a timely Opposition thereto, and Plaintiffs have filed a timely Reply brief. (*See* MDL Docket Nos. 2379 (Opposition) & 2389–12 to –24 (Reply)).[2]

Supplemental briefing was filed by both parties. First, in response to Plaintiff's Reply and accompanying Declarations, on March 30, 2012, Toyota filed its Objections to Arguments Raised for the First Time in Reply or to File a Sur–Reply and its Objection and Motion to Strike the Caruso Declaration. (*See* MDL Docket Nos. 2347 & 2348). Thereafter, on April 2, 2012, Plaintiffs filed their Response to Toyota's Objections to the Reply, Motion to Strike, and for Leave to File a Sur–Reply. (MDL Docket No. 2349.)

The Court held a telephonic conference on April 9, 2012. Thereafter, the Court issued an Order permitting further briefing. (MDL Docket No. 2395.)

Pursuant to that Order, Toyota filed its Sur–Reply and supporting evidence on May 7, 2012. (MDL Docket No. 2503.) Plaintiffs filed their Response to Toyota's Sur–Reply on May 8, 2012, along with additional evidence. (MDL Docket No. 2510.)

A week later, in a filing not contemplated by the Court's April 9, 2012, Toyota filed its Objections to Arguments Raised for the First Time in Plaintiff's Response to Toyota's Sur–Reply, along with supporting evidence. (MDL Docket No. 2534.) This led to Plaintiffs filing another brief, which, in turn, resulted in another filing by Toyota.[3] (MDL Docket Nos. 2599 & 2617.)

The Court heard this matter on May 30, 2012. (MDL Docket No. 2633.)

With the present Motion, Plaintiffs seek sanctions for the alleged spoliation[4] of evidence. Specifically, Plaintiffs object to the inspection of the Van Alfen vehicle without their consent or their presence. For the reasons set forth at length herein, the Court grants in part and denies in part the Motion for Terminating Sanctions.

## I. *Relief Sought by the Present Motion*

The present Motion is premised upon Toyota's actions in inspecting the Van Alfen vehicle, including reading data from the Event Data Recorder ("EDR"), without obtaining the consent of the owner of the vehicle. Plaintiffs contend that by doing so, certain data was or could have been altered or destroyed. (Notice of Motion (Docket No. 2244–1) at 3.) As the briefing evolved, Plaintiffs also raised an issue regarding the physical inspection of the vehicle, including an issue regarding a broken piece of plastic found in the throttle body.

Plaintiffs seek imposition of non-monetary sanctions. Their preferred relief is imposition of terminating sanctions. (*Id.*) Where terminating sanctions are imposed against a defendant, the Court enters default against the sanctioned defendants, which effectively adjudicates the issue of liability against those defendants and leaves open only the issue of the amount of damages. *See In re Exxon Valdez*, 102 F.3d 429, 433 (9th Cir.1996).

Alternatively, Plaintiffs seek an evidentiary sanction, precluding Toyota from introducing evidence related to electronic data acquired from the Van Alfen vehicle, and

---

2. Much of the briefing and most of the declarations filed in connection with the present Motion were originally filed under seal. After consideration of the issue by the Court, the Court issued an Order to Show Cause ("OSC") why most of those documents should not be filed publicly. (MDL Docket No. 2333.) Thereafter, the parties agreed with the Court's suggestion that the documents at issue should not be filed under seal (MDL Docket Nos. 2351 & 2352), and they filed publicly accessible documents, which the Court cites herein. The vast majority of the present record is now publicly available, and the Court cites publicly available documents whenever possible.

3. At this point, the Court pauses to remind the parties of the rationale underlying the meet-and-confer requirement of Local Rule 7–3. (*Cf.* May 30, 2012 Tr. at 4.)

4. "Spoliation" is defined as the "intentional destruction or alteration of evidence, or the knowing failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Black's Law Dictionary* 1409 (7th ed. 1999).

precluding Toyota from further inspection of the Van Alfen vehicle. (Notice of Motion at 3.)

Should the Court be disinclined to impose either of those alternatives, Plaintiffs seek an adverse inference jury instruction related to this evidence.[5] (*Id.*)

II. *Factual Background*

█ The factual background against which Plaintiffs seek relief is complex,[6] and is at times contested. Where necessary, courts may make factual findings supporting the imposition of discovery sanctions. *See Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1052 (9th Cir.1998) (reviewing for clear error a district court's factual findings supporting discovery sanction of dismissal of claims).

A. *The UHP Investigated the Fatal Van Alfen Collision*

The Utah Highway Patrol ("UHP") investigated the Van Alfen collision. (*See generally* Robinson Decl. Ex. 3 (UHP Report (MDL Docket No. 2389–3 to –4)).) As reported therein, the fatal, tragic vehicle collision that has led to the present individual action was a one-car crash that occurred on November 5, 2010; the collision claimed the lives of the driver and one passenger and injured two other passengers. (*Id.* at 112 & 116.) The weather condition was dry and sunny at the time of the collision; the roadway was unobstructed. (*Id.* at 116.) The car was traveling westbound on I–80 when it exited a downward sloping ramp into a T-shaped intersection at a road that leads to Wendover, Utah. (*Id.*) The UHP analyzed skid marks, and concluded that the car swerved to the right (to avoid cars stopped at the intersection) as it was coming down the off ramp before hitting and going over a curb. (*Id.*) The car continued over the sidewalk, then it

struck a rock wall and went partially up the rock wall before coming to a stop. (*Id.*)

All four occupants were injured. The driver, Paul Van Alfen, died at the scene. (*Id.*) A rear seat passenger, Charlene Lloyd, died the following day at the hospital. (*Id.*) The front seat passenger, Plaintiff Shirlene Van Alfen, was hospitalized for several days with her injuries. (Robinson Decl. Ex. 10 (MDL Docket No. 2389–6 to –7) at 213.) The final passenger, Paul and Shirlene's son Cameron, who was seated in the rear seat, was treated for injuries and released from the hospital the day of the collision. (*Id.* at 216.)

At the scene, both Cameron and Shirlene reported to UHP Sgt. Nathan Croft that Paul was applying the car's brakes at the time of the crash. (UHP Report at *Id.* at 117.) Sgt. Croft was unable to interview Paul and Charlene due to the extent of their injuries. (*Id.*)

Witnessing the incident were Sarah Adam, Lizbette Carlos, Sheri Grygla, MaryAnn Leigh, Ella Miller, Asher Spencer, Scott and Christi Tufts, and Bobbi Jo Wilde. (*Id.* at 116–17.) Several of these witnesses, including Sarah Adam, Christi Tufts, and Sheri Grygla, reported that they saw brake lights illuminated on the rear of the vehicle as it came down the ramp. (*Id.* at 117–18.)

A posthumous blood screening of Paul was negative for alcohol and certain specified drugs. (*Id.* at 122.)

Trooper Miller prepared an investigation report for the UHP, making notations about a physical inspection of the brakes, on-scene photos, the EDR download by Dynamic Science, Inc. (on behalf of the National Highway Traffic Safety Administration ("NHTSA") and Toyota. He noted in part:

**NOTE: The right front brake rotor appeared to have brake shoe resin build-**

5. Plaintiffs' proposed instruction seems both vague and overly broad. Plaintiffs ask the jury be instructed that "if evidence regarding a specific condition of the vehicle is in dispute or lacking, then as to that issue, you are to draw any inferences and resolve any uncertainties against Toyota and in favor of the Plaintiffs." (Pltfs.' Prop'd Order (MDL Docket No. 22–5) at 1.) Although the Court sets forth a preliminary instruction near the conclusion of this Order, the

final wording of the instructions to the jury will be reserved for trial.

6. Herein, the Court merely summarizes the most relevant evidence presented by the parties. The Court has, however, reviewed all the briefs and evidence filed by the parties with respect to the present Motion.

up on the outer surface as well as heat transfer indication on the top of the rib of the inside (length of pad)— **May be indicators that the right front brake was heavily used at the time of the crash[.]**

. . . .

*On-scene pictures show brake lights were on (Including 3rd brake light) at vehicle rest position[.]

. . . .

<CRASH DATA RETRIEVAL>

*EDR removed and put into evidence/NHTSA and Toyota downloaded [attached]

Note: Some information was only readable by Toyota[.]

. . . .

CONCLUSION

*Evidence suggests that catastrophic mechanical failure was not a factor in this crash. However, evidence also suggests that the accelerator pedal recall that had not been performed on this vehicle and[/]or some other system failure may have been a contributing factor.*

(*Id.* at 137–39 (typeface in the original).)

B. *Consent Regarding the Vehicle Inspection*

Toyota's internal documents reveal that its procedures for vehicle inspections generally include obtaining consent for EDR download. (*See, e.g.,* Robinson Decl. Exs. 25–28, 31–32 & 36 (MDL Docket No. 2389–10 to –11); *see also* Ex. 27 at 370 ("Toyota Data Readout Authorization and Consent" form).) The testimony of the Toyota SMART Team leader Tony Minyon suggested Toyota generally sought written consent in advance of any vehicle inspections to prevent a vehicle owner from changing his or her mind regarding an EDR download once the SMART team had arrived on site. (Minyon Depo. (Galvin Decl. Ex. C (MDL Docket No. 2503–4)) at 11.)

According to internal Toyota documents, on November 12, 2010, a week after the fatal collision and a week before the inspection, Toyota understood from Sgt. Croft that the UHP would not download the data in the absence of a request from the Van Alfen family. (Robinson Decl. Ex. 9 (MDL Docket No. 2389–6 (Toyota "Full Case Detail")) at 192.) Toyota also understood from Sgt. Croft that the family was represented by counsel. (*Id.*)

More specifically, the "Full Case Detail" of the Toyota SMART team report indicates the following entries on November 12, 2010, one week after the collision: A case was "open[ed]" pursuant to an email received by the Executive Officer from S. Farr that contained a news link to an article regarding the Van Alfen collision. (*Id.* at 199.) The first and second entries merely summarize the salient facts reported in the article. (*Id.*) A third entry summarizes a conversation between a Toyota representative and Sgt. Croft regarding the EDR download, and notes that the UHP would not undertake an EDR download in the absence of a request by the family. (*Id.* ("Sgt Croft sts that their dept is not seeking to get the EDR info unless the family request[s] the EDR data.").) That entry also states that the family was represented by counsel. (*Id.* ("Sgt Croft sts the family has an attorney and he will contact the family to determine if they would like to have EDR information.").) The entry also notes Sgt. Croft's contact information. (*Id.*) Two subsequent entries on the unredacted version dated 11/15/2010 and 12/03/2010 note details regarding the physical location of the vehicle and its EDR and a closing entry, respectively. (*Id.* at 199–200.)

Four other entries were redacted by counsel, presumably on the basis of privilege. An unredacted version of the Full Case Detail was eventually produced, and was filed with the Reply brief. (*See* Robinson Reply Decl. (Docket No. 2389–18) Ex. 6.) Significantly, in one of those previously redacted entries, the writer notes: "Rcvd email from S. Farr to please stop all efforts on this inspection."[7]

---

7. This email has only recently been produced. (Robinson Reply Decl. (MDL Docket No. 2389–24) Ex. 21 (March 26, 2012, letter from Toyota counsel that despite a "diligent" and ongoing search, "Toyota . . . has not been able to locate" the email").) Neither the Full Case Detail nor the email bear any indicia of privileged communications, and Toyota counsel have not explained why these materials were withheld on a claim of privilege.

(*Id.* at 3.) Two other previously redacted entries also refer to the 11/15/2010 email, but otherwise just make notations regarding the location of the vehicle and the writer's intent to "follow daily Go N See List to determine next step with case." (*Id.* at 3–4.) The fourth previously redacted notation notes that the vehicle inspection took place and that the "Legal Dept will mail out response ltr with Toyota's position within 30 days from the inspection date." (*Id.* at 4.) The notations do not reconcile the command stated in the unproduced email from S. Farr to "stop all efforts on this inspection" and the fact that the inspection took place.

The Farr Declaration, filed in connection with the Sur–Reply, states that she asked customer service to "stop all efforts on this inspection" because SMART team member Tony Minyon was in contact with NHTSA, which had "invit[ed] Toyota's SMART team to participate in an inspection" that it "was coordinating with the UHP." (Farr Decl. (MDL Docket No. 2503–13) ¶ 5.)

Barry Hare, TMS's National Design & Technical Analysis Manager, actually performed the download of the Van Alfen EDR. (Hare Decl. (Docket No. 2379–4) ¶¶ 2 & 9–10.) He reports his understanding of the issue of consent as follows: "Tony Minyon of SMART [Toyota] advised me that he learned from NHTSA that the UHP told Mr. Perry [of DSI, with which NHTSA contracted to do an inspection of the Van Alfen vehicle,] that the legal vehicle owners had given verbal consent to proceed with the inspection and EDR imaging, and that the UHP confirmed with its legal counsel that a court order was not required in order to proceed with the inspection." (*Id.* at ¶ 7.) Hare's deposition testimony is consistent with this account. (*See* Hare Depo. (Galvin Decl. Ex. F (MDL Docket No. 2503–4) at 46.) Hare testified "it was our understanding that the family had given their consent to the police, and we heard about that through NHTSA." (*Id.*))

The testimony of Joseph Lane, another Toyota technician present at the inspection, is in accord. (*See* Lane Decl. (MDL Docket No. 2379–5) ¶ 6 (but omitting reference to Mr. Perry).) So is Lane's deposition testimony. (*See* Lane Depo. (Galvin Dec. Ex. G

(MDL Docket No. 2503–4)) at 48.) Lane testified that he understood that NHTSA told Minyon "that the [UHP] had said that they had verbal permission to download the EDR data." (*Id.*)

In turn, Minyon, National Accessory Chief Engineer, notes that NHTSA's Office of Defect Investigations ("ODI") called to inquire regarding the service history for the Van Alfen vehicle, and that on November 15, 2010, ODI "invit[ed] the SMART team to participate in an inspection that ODI was coordinating with the UHP." (Minyon Decl. (MDL Docket No. 2379–3) ¶ 4.) ODI advised Toyota that Trooper Miller had set up the inspection for Friday, November 19, 2010. (*Id.* ¶ 5.) When Minyon asked ODI if they had secured a search warrant, ODI asked Perry to inquire. (*Id.* ¶ 7.) Mr. Perry learned from Trooper Miller that UHP had verbal consent to inspect the vehicle and that, in any event, the UHP's legal counsel had advised that no consent was needed. (*Id.*)

Minyon's emails reflect an understanding that as of November 15, 2010, the UHP would not permit Toyota to download the EDR, but that as of November 18, 2010, based on the "verbal confirmation" of "the legal vehicle owners," that download would be permitted. (*Compare* Galvin Decl. Ex. D (MDL Docket No. 2389–4) ("The police have not given us permission to image the EDR yet.") *with id.* Ex. E ("Trooper Miller confirmed with the Attorney General that they do not need a court order to inspect or image the EDR, however they did receive verbal confirmation from the legal vehicle owners[.]").)

For his part, Trooper Miller denies he ever obtained consent from anyone in the Van Alfen family for the EDR download. In a declaration submitted with the Reply documents, he states that he "never got permission, authorization or consent to download the [EDR] from any member of the Van Alfen family, any attorney . . ., or anyone else acting on their behalf." (Miller Decl. (MDL Docket No. 2331–4) ¶ 3.) He notes that Perry contacted him a couple days before November 19, 2010, regarding the inspection, that he assumed NHTSA and Toyota coordinated the scheduling of the inspection, and that he did not himself schedule it. (*Id.* ¶ 6.)

Sgt. Croft testified that he did not ever obtain permission from the family to download the EDR data. (Croft Depo. (Robinson Decl. Ex. 5 (MDL Docket No. 2389–05 to –06) at 101–03.)) Instead, he believed, based on Trooper Miller's representations, that NHTSA had authority to download the data "because they are the agency to kind of investigate stuff like that," and "that NHTSA brought Toyota" to the inspection. (*Id.* at 101–02.)

The day after the collision, Sgt. Croft removed the EDR and the tail lights from the car, giving the EDR to Trooper Miller, who at first kept the EDR but who later returned it to Sgt. Croft, reporting that he was unable to get the EDR downloaded in the absence of the family's request. (UHP Report at 118.) According to the UHP Report, Trooper Miller was to have the EDR downloaded at "Toyota in Salt Lake [City]." (*Id.* at 118.) The record is unclear, but implies that a Toyota dealership declined to download the data in the absence of consent from the vehicle's owner. (*See id.*)

No party has submitted a declaration from Perry or any ODI representative on the issue of consent from the Van Alfen family. The report commissioned by NHTSA and authored by Dynamic Science, Inc. ("DSI"), reports that "[p]ermission to image the Event Data Recorder (EDR) was obtained from the vehicle owner by the investigating police agency," presumably referring to the UHP. (Robinson Decl. Ex. 10 (MDL Docket No. 2389–6 to –7) at 200.)

## C. *The November 19, 2010 Vehicle Inspection*

That November 19, 2010 inspection and EDR download resulted in two reports, one by DSI on behalf NHTSA and another by Toyota. (*See* Robinson Decl. Exs. 10–11 (MDL Docket No. 2389–6 to –7).)

### 1. *Inspection Reports*

#### a. *Dynamic Science, Inc., Report*

The DSI Report notes the date and site and other details of the crash, including the occupants and their injuries. (Robinson Decl. Ex. 10 ("DSI Report" at 1.)) The report analyzes the crash as six separate events: (1)-(2) the front tires impacted the curb, (3) the vehicle impacted with the embankment (described in the UHP report as a rock wall), (4)-(5) the rear tires impacted the curb, and finally (6) the vehicle partially climbed the embankment. (*Id.* at 6.)

Dynamic Science used Toyota's Readout Tool ("ROT").[8] (*Id.* at 2.) EDR data reported the speed of the vehicle at 55.9 mph at five seconds before impact that declined to only 53.4 mph at 1 second before impact. (*Id.* at 9.) The accelerator voltage remained constant at .87 volts, as did the engine RPM, measured at 1200. (*Id.*) Both the brake and the accelerator show in the "OFF" position. (*Id.*) The "Freeze Signal" indicator showed "Freeze," and the "Writing Flag" showed "Finished Writing." (*Id.*)

The crash data shows air bag deployment and safety belt pre-tensioner deployment at 97 and 96 milliseconds ("ms"), respectively. (*Id.* at 10.) A maximum longitudinal Delta–V[9] of –34.8 mph was recorded at 200 ms. (*Id.* at 3 & 9.)

In addition to downloading the EDR data, Dynamic Science conducted a physical inspection of the vehicle,[10] which included a

---

8. An internal Toyota document dated April 2010 reveals that Toyota considered the "Beta Toyota SRS Airbag EDR Readout Tool" to be unreliable in certain instances. (Robinson Decl. Ex. 11 (MDL Docket No. 2389–7) at 220.) Specifically, that document refers to the ROT as a "prototype," notes that "nondeployment or low delta V events may be overwritten by subsequent impact events," and that "it is possible that the use of th[e tool] may alter certain service diagnostic memories in some instances." (*Id.* & Ex. 27 (MDL Docket No. 2389–10) at 368.)

9. As the Court understands it, the "Delta–V" reading indicates a change in velocity, or speed, within a specified time period. Here, that value represents a negative change in velocity—a decrease in speed—of 34.8 mph in 200 ms, or 2/10 of one second.

10. Some of the report's observations (*e.g.*, air bag deployment) may have originated with an examination of UHP photographs. It seems clear, however, that DSI physically inspected and handled the vehicle's brakes and throttle. (*Id.* at 12; *accord* Clark Decl. (MDL Docket No. 2331–5) ¶ 6

physical inspection of the butterfly valve in the throttle ("found in the closed position") and the brakes.[11] (*Id.* at 12.)

### b. *Toyota Report*

The Toyota Report reports the same EDR pre-crash data. (Ex. 11 ((MDL Docket No. 2389–7) ("Toyota Report")) at 221–22.) Additionally, it presents a graph that measures the velocity change in the vehicle in 10 ms increments, from 10 to 200 milliseconds. (Toyota Report at 223.)

### 2. *Testimony Regarding Original Physical Inspection of Van Alfen Vehicle*

After the initial filing of the present Motion, on February 28, 2012, Plaintiffs obtained the declaration of Lonnie Clark, a percipient witness to the inspection of the Van Alfen vehicle and the owner of "The Shop," a repair, storage, and towing facility in Wendover, Utah, where the inspection took place. (*See generally* Clark Decl. (MDL Docket No. 2331–5).)

According to Clark, sometime around 9:00 to 10:00 a.m. on November 19, 2010, Sgt. Croft and Trooper Miller arrived at The Shop, bringing the Van Alfen EDR with them. (*Id.* ¶ 4.) A man who said he was from NHTSA (presumably Perry) arrived around the same time. (*Id.* ¶ 5.) At Trooper Miller's direction, Clark set up the Van Alfen vehicle, removing the tires so the brakes could be inspected. (¶ 6.)

Around noon, one Toyota technicians from Denver, two Toyota technicians from California and a lawyer for Toyota arrived. (*Id.* ¶ 7.)

Clark stated in his Declaration that Perry and the Toyota technicians and lawyer would walk away from him and the UHP officers to talk in private, sometimes discussing their apparent mutual conclusion that "it was clearly not the car's fault." (Clark Decl. ¶ 12.)

Clark observed the Denver Toyota technician "physically remove the brake caliper and brake shoe from the axle of one of the right wheels on the passenger side of the vehicle." (*Id.* ¶ 10.) The technician looked at them, then took a "large pair of channel locks from [Clark's] tool box," use them "to clamp down on the caliper and brake shoe and put them back on the axle." (*Id.* ¶ 10.) Clark tried to stop the technician from doing this. (*Id.* ¶ 10.)

Clark also saw the same technician inspecting the engine compartment of the vehicle. (*Id.* ¶ 11.) At this time, Clark saw "a piece of something that looked like plastic that was wedged in the throttle body [that was] keeping the plate partially open." (*Id.* ¶ 11.) The technician removed it, despite Clark telling him "to stop, [to] stay away from the engine, and not to displace anything." (*Id.* ¶ 11.)

After additional discovery, and after supplemental briefing, it has become evident that the issue of where the plastic part was originally found is hotly contested. Although Clark testified that the piece of plastic was originally wedged in the throttle valve, holding it open, two Toyota technicians categorically deny Clark's account.

Overall, Clark's testimony is consistent with his Declaration. Clark testified that while standing three to four feet behind a Toyota technician (either Lane or Hare), he observed the technician use pliers to remove the plastic that was wedged in the throttle body holding the throttle plate only partially open.[12] (Clark Depo. (Supp'l Robinson Decl.

---

(tires removed for brake inspection at instruction of Trooper Miller).)

**11.** Although noting the observations of the UHP regarding brake residue buildup indicative of heavy brake usage, and although purporting to refute the suggestion of brake usage "[b]ased on the EDR and scene evidence obtained during the SCI investigation," DSI nevertheless does not note whether there was, or was not, brake residue buildup. (*Compare* UHP Report at 137 *with* DSI Report at 12.)

**12.** Toyota argues that Clark merely "believed" or "understood" this to be the case, but that he did not "know" it to be true. (Sur–Reply (MDL Docket No. 2503) at 13; Tr. at 21–22.) However, a review of Clark's testimony reveals that Clark understood that the piece of plastic was wedged in the throttle body in a manner keeping the throttle valve open because he observed the throttle valve in a partially open position (about one quarter of the way) and that in the absence of something holding the valve open, it should have appeared in the closed position. (Clark

Ex. 1 (MDL Docket No. 2510–2 to –3)) at 38–41.) Specifically, Clark testified that "[t]he throttle plate was open," and that when the piece of plastic "was pulled out, it was closed." (*Id.* at 128.) Before the removal of the piece of plastic, Clark estimated that the throttle valve was open about a quarter of the way. (*Id.* at 132.) Clark voiced an objection to the removal of the piece of plastic, and after Clark told the technician "Don't", the technician dropped the piece of plastic back into the throttle body, where it came to rest on top of the throttle plate. (*Id.* at 41.)

Trooper Miller's Supplemental Declaration indicates that he heard Clark addressing the Toyota technicians and objecting to what they were doing: "During the inspection on November 19, 2010, I heard Lonnie Clark ... loudly tell a Toyota technician to stop doing something. I believe Lonnie yelled something like **"Don't!"** When Lonnie yelled this, it immediately caught my attention." (Supp'l Miller Decl. (MDL Docket No. 2510–38) ¶ 3 (emphasis in the original).) He didn't see what occurred before this time, but when he heard Clark, he "went over to see what ... Clark's concern was." (*Id.* ¶ 4.) He then photographed "a piece of plastic that was partially on the throttle intake housing and partially on the butterfly plate." (*Id.*)

Toyota's technicians tell a different story. Barry Hare testified that they found the piece of plastic resting on the closed throttle valve, and that he picked it up and photographed it before replacing it in the same position. (Hare Depo. (Supp'l Robinson Decl. Ex. 3 (MDL Docket No. 2510–7 to –8)) at 157–59 & 218–19.)

Joseph Lane testified similarly. (*See* Lane Depo. (Supp'l Robinson Decl. Ex. 6 (MDL Docket No. 2510–13 to –14)) at 62–63.) He testified that after he "removed the air intake tube ... [the] piece of plastic [was]

sitting on top of the throttle body valve." (*Id.* at 62.) He expressly denied the possibility that the piece of plastic was wedged in the throttle valve keeping the valve partially open. (*Id.* at 62–63.) He also denied handling the piece of plastic with a pair of pliers. (*Id.* at 63.)

### 3. *Expert Reports and Testimony*

The parties have submitted the no fewer than ten expert Declarations [13] from six experts relating to two relevant issues: The reliability of the data obtained from the EDR download and the broken piece of plastic found in the throttle body.

#### a. *Reliability of EDR Download*

##### i. *Mahon Declarations*

Geoffrey Mahon is Plaintiffs' technical consultant. (Mahon Decl. (MDL Docket No. 2244–3) ¶ 2.) He describes the Supplemental Restraint System Electronic Control Unit ("SRS ECU") contained in the 2008 Camry, its sensors, and the method whereby it is determined that there is a crash of sufficient severity to deploy the vehicle's airbags and seat belt pre-tensioners. (*Id.* ¶ 3.) The sensors also write data to a memory chip when sufficient deceleration is sensed. (*Id.* ¶ 4.) Mahon criticizes the failure of the inspectors to reconnect the EDR to the vehicle, which he states is the "generally accepted practice in the industry." (*Id.* ¶ 8.) By reconnecting the EDR in this manner, there is no ability to incidentally or intentionally alter the data in the EDR; however, download of the EDR via direct connection to the SRS ECU has the potential to allow data alteration, using appropriate software. (*Id.* ¶ 8.) Only when power cannot be supplied to the vehicle, which was not the case here,[14] should the download proceed in the manner it did. (*Id.*

---

Depo. at 38–39.) He also testified that once the piece of plastic was removed from its wedged position, the technician placed it in a manner such that it came to rest on the top of the valve. (*Id.* at 40.) The Court does not find Clark's testimony on this subject to be equivocal in nature or to be inconsistent with his Declaration.

**13.** These totals do not include the Declaration of Donald H. Slavik, which has been withdrawn. (*See* MDL Docket Nos. 2281 & 2350.)

**14.** Mahon notes that a Toyota document so states, and the Court assumes this is true. (*Id.* ¶ 7.) Although Mahon purports to attach a "Toyota Field Technical Report" and a "REDACTED GO and See Report" as Exs. B and C to his declaration, they are not attached thereto.

¶¶ 7 & 9.) In Mahon's experience, in litigation, when this is done, it is done in the presence of all parties and done only with a non-proprietary readout tool that lacks the ability to alter any data. (*Id.* ¶ 9.)

In response to criticism by Toyota's declarants (see below), Mahon submitted a Supplemental Declaration. Therein, he discusses his experience in designing SRS ECUs that have been installed in over one million motor vehicles. (Supplemental Mahon Decl. (MDL Docket No. 2331–2) ¶ 4.) He was involved in "end-of-the-line testing" of these units, and describes himself as being "intimately familiar with their function and limitations." (*Id.*) He describes that SRS ECUs are tested by attaching a computer device to the ECU connector, and tools built and/or programmed by the SRS ECU manufacturer that are "used to erase and overwrite the data ... with any values selected by the user." (*Id.* ¶ 7.) Toyota's use of a proprietary tool that utilizes passwords to access the EDR is similar to methods he has used to overwrite data in another SRS ECU. (*Id.* ¶ 8.)

ii. *Caruso Declaration and Testimony*

With the Reply, Plaintiffs offer the declaration of Chris Caruso, who has experience in design and development of safety systems, including EDRs. (Caruso Declaration (MDL Docket No. 2331–6) ¶¶ 3–12.) Caruso is familiar with Toyota's EDR and ROT, as well as the Supplemental Restraint System in which the EDR is found. (*Id.* ¶¶ 17 & 22.) Caruso opines that data stored in the EDR is susceptible to alteration or destruction when exposed by an EDR ROT "depending on the quality, reliability and actual design intent of the imbedded software." (*Id.* ¶ 27.) Caruso states that each EDR manufactured by one of his prior employers would be tested during final production, and then the test data would be overwritten. (*Id.* ¶ 28.) He states that both he and Toyota expert Douglas Nunan, while working for an employer other than Toyota, had laptop computers with software versions of EDR readout tools that allowed them to input a password to open up Electronically Erasable and Programmable

Read–Only Memory ("EEPROM") memory to make any changes to any codes or calibrations they wanted to change. (*Id.* ¶ 29.)

Caruso also describes a scenario in which the user of a ROT would be unaware he or she was altering the EDR data. (*Id.* ¶ 32.) "It is technically feasible that, by selecting the proper 'password' prior to an EDR, the ROT can rewrite, alter, overwrite or corrupt data and certain areas of the EEPROM before downloading." (*Id.* ¶ 32.) The end user would be unaware of these changes. (*Id.* ¶ 33.) Caruso noted his experience with other Toyota EDR downloads, in which a password is selected for the ROT by Toyota from a long list of passwords, conferring the opportunity for implementing this type of alteration. (*Id.* ¶¶ 33–34.)

Further, NHTSA also used Toyota's ROT with a password supplied by Toyota. (DSI Report at 207.) This, in Caruso's view, casts doubt on the EDR data read by Toyota even though it matches NHTSA's "first read" of the EDR data. (Caruso Decl. ¶ 35.)

Specifically, at his deposition, Caruso identified a difference in sixteen bytes of the raw hexadecimal data read by Toyota's ROT on November 19, 2010, and the April 17, 2012 EDR download using the Bosch CDR. (Caruso Depo. (Robinson Decl. Ex. 8 (MDL Docket No. 2510–16 to –17)) at 149–50.) The former read the data as "FF" (for a hexadecimal value of 16, 16) while the latter read "00" (for a hexadecimal value of 0, 0). (*Id.*)

iii. *Nunan Declarations*

Toyota offers the declarations of Douglas A. Nunan, its technical consultant with experience in design and development of airbag electronic control units. (Nunan Decl. (MDL Docket No. 2379) ¶ 2.) He is familiar with the 2008 Camry SRS, its EDR, and Toyota's ROT. (*Id.* ¶¶ 4–6.) He offers the opinion that pre-crash and crash data is collected in EDR and is "frozen" by coding the SRS software to write the data to a particular address that is protected from overwriting by the microcomputer in the SRS center sensor assembly. (*Id.* ¶ 6.) The "freeze" signal is generated and recorded.[15] (*Id.* ¶ 6.) He offers the una-

---

15. Both the DSI Report and the Toyota Report indicate the freeze signal was triggered. (DSI

dorned opinion: "The data frozen in the EDR cannot be deleted or altered during the imaging of the EDR through the use of software or inputs from the Toyota Read Out Tool . . . ." (*Id.* ¶ 7.)

Nunan also offers the opinion that it was not unacceptable to download the EDR outside of the vehicle in light of the fact that the UHP had already removed the EDR and that doing so was "the least intrusive and most straight forward means of imaging the EDR." (*Id.* ¶¶ 14–15.)

In his Supplemental Declaration (MDL Docket No. 2503–7 (public redacted version)), and in response to the opinions from Plaintiffs' experts regarding the possibility that a password could be used to activate a program that could be used to destroy or alter data, Nunan notes that the password is selected from a number of passwords maintained by Toyota based on the part number of the Center Sensor Assembly (of which the EDR is a part). (*Id.* ¶ 6.) He tested the passwords used in connection with the Van Alfen vehicle, and reports that those tests resulted in read-only messages requesting information. (*Id.* ¶ 7.) Essentially, Nunan opines that his testing refutes the actual occurrence of Plaintiffs' experts theoretical possibility that the EDR data was alter through the use of passwords and the failure to reattach the EDR to the vehicle prior to reading it. (*Id.* ¶¶ 23–27.)

Nunan also explains that differences in the values of certain hexadecimal data are unrelated to the crash data and instead relate to non-crash vehicle identification number ("VIN") data. (*See id.* ¶¶ 6–11 & Ex. C.)

### iv. *Shibata Declaration*

The Shibata Declaration offers the same opinion as Nunan, that the data is frozen and cannot be deleted or altered. (Shibata Decl. (MDL Docket No. 2379–1) ¶¶ 8 & 14.)

He also states: "There is no software of which Toyota is aware that can be used with the Toyota ROT to alter data stored in the EDR after a deployment command has been sent by the SRS center sensor assembly." (*Id.* ¶ 15.)

Report at 208; Toyota Report at 221.)

### b. *Broken Plastic Part*

#### i. *James Declaration*

As part of the supplemental briefing permitted by the Court, after Plaintiffs filed the Clark Declaration regarding the piece of plastic found in the throttle body, Toyota submitted the expert opinion of Michael B. James, an engineer specializing in accident reconstruction and vehicle crash-worthiness research. (James Decl. (MDL Docket No. 2503–14) ¶ 2.) James acknowledges that "[a] piece of broken plastic was found in the throttle body." (*Id.* ¶ 5.) He further notes that "[t]he piece of plastic was photographed, removed from the throttle body so that the throttle valve could be inspected, and then the piece of plastic was put back in the throttle body." (*Id.*) James offered the opinion that the plastic did not enter the throttle body until after the crash. (*Id.* ¶ 25(3).) James characterizes the piece of plastic as "crash debris" that "has nothing to do with the crash." (*Id.* ¶ 25(4).)

#### ii. *Kitchen Declaration*

For their part, Plaintiffs offer the declaration of Myles Kitchen, who participated in an April 17, 2012, inspection of the Van Alfen vehicle. (Kitchen Decl. (MDL Docket No. 2510–29) ¶¶ 9 & 16.) With assistance, he guided an imaging tool into the throttle body, finding and imaging what he believes to be a distinctive scratch in the normally occurring carbon-build up on the walls of the intake manifold. (*Id.* ¶ 11 & 13.) Based on this observation, and other evidence, he offered the opinion that the "piece of plastic had to travel through the intake plumbing to reach [the] location [where it was found.]" (*Id.* ¶ 13.) For the plastic to travel through the intake plumbing, "the engine had to have been running at the time, and the throttle necessarily had to have been open, creating vacuum and negative pressure to create the airflow necessary to move such an object through the intake ducting, and into the throttle body." (*Id.*)

### iii. *Supplemental James Declaration*

In response, Toyota offers the Supplemental James Declaration (MDL Docket No. 2574). James who inspected the vehicle on April 17, 2012, responds to Kitchen's opinion by stating that the observed mark is not a scratch in the carbon build-up; rather, it is merely "a seam line of a joint between two plastic parts that are joined to form the intake manifold." [16] (*Id.* ¶ 8.)

### III. *Duty to Preserve Evidence Generally and Applicability of the Preservation Order*

The Court pauses here to address an argument that the relevant Preservation Order (Docket No. 243) negotiated by the parties and entered by the Court does not apply. The Toyota Defendants note two provisions that suggest at the time of the Van Alfen collision, the Preservation Order did not apply. (*See* Opp'n (MDL Docket No. 2379 at 8–9 & 13).) The Toyota Defendants are correct that the literal terms of Preservation Order do not address pre-litigation preservation duties.

Nevertheless, the Preservation Order appears to be an attempt by the parties to articulate their understanding of their existing preservation duties pursuant to the Federal Rules of Civil Procedure as applied to the circumstances of the present MDL. (*See* Preservation Order at 2 ("The Order does not expand the preservation requirements under the Federal Rules of Civil Procedure, and it does not limit any protection provided by Fed.R.Civ.P. 37(e) or other applicable Rules.").) Thus, whether measured by the Federal Rules of Civil Procedure or by the Preservation Order, the parties' duties are the same. [17]

Unquestionably, there is a duty to preserve evidence that arises before litigation is filed. Although the Court has not found a Ninth Circuit case directly on point, district courts throughout the Ninth Circuit have repeatedly held that where a party should reasonably know that evidence is potentially relevant to anticipated litigation, that party is under the obligation to preserve that evidence. *See, e.g., United States ex rel. Berglund v. Boeing Co.*, 835 F.Supp.2d 1020, 1050–51 (D.Or.2011); *Surowiec v. Capital Title Agency, Inc.*, 790 F.Supp.2d 997, 1005 (D.Ariz.2011); *Morford v. Wal–Mart Stores, Inc.*, No. 2:09–CV–02251 RLH (PAL), 2011 WL 635220, at *3 (D.Nev. Feb. 11, 2011); *Carl Zeiss Vision Intern. GmbH v. Signet Armorlite, Inc.*, No. 07–CV–0894 DMS (POR), 2010 WL 743792, at *14 (S.D.Cal. March 1, 2010); *Rev 973 LLC v. Mouren–Laurens*, No. CV 98–10690 AHM (Ex), 2009 WL 273205, 1 (C.D.Cal. Feb. 2, 2009); *In re Napster, Inc. Copyright Litig.*, 462 F.Supp.2d 1060, 1067–68 (N.D.Cal.2006); *Performance Chevrolet, Inc. v. Market Scan Info. Sys.*, No. CV–04–0244 BLW, 2006 WL 1042359, at *1 (D.Idaho Apr. 18, 2006). Other Circuits have also so held. *See, e.g., Micron Technology, Inc. v. Rambus, Inc.*, 645 F.3d 1311, 1320 (Fed.Cir.2011); *Silvestri v. General Motors Corp.*, 271 F.3d 583, 590 (4th Cir.2001); *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998).

Litigation regarding the Van Alfen collision should have been anticipated, and likely was actually anticipated, by the Toyota Defendants. The present MDL, consolidating hundreds of cases involving allegations of

---

**16.** Plaintiffs effectively concede this issue, noting their agreement that the observed scratch "appears to be a seam." (Plaintiff's Response to Toyota's Sur–Sur–Reply (MDL Docket No. 2599) at 2.) However, they point out that other photos attached to the James Declaration show black marks (identified as "coking") above the butterfly valve in the throttle very near the location identified by Lane as the place where the Toyota technicians removed the piece of plastic. (*Id.* at 2–4.) Toyota effectively refutes this argument of counsel with the filing of the Second Supplemental James Declaration (MDL Docket No. 2617) ¶¶ 3–5), which show examples of other coking

marks in other throttle bodies found in vehicles found in salvage yards.

**17.** By the same token, the result reached by the Court today is the same regardless of whether the analysis proceeds under Rule 37(a)(2) or pursuant to the Court's inherent power. *Cf. Unigard Sec. Ins. Co. v. Lakewood Engineering & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir.1992) (holding that where no discovery order was violated, sanctions could not imposed pursuant to Rule 37, but nevertheless upholding the sanction order under the court's inherent power).

SUA, was created seven months before the Van Alfen collision, and the public controversy regarding SUA arose in advance of this MDL. (*See* MDL Docket No. 1 (dated April 23, 2010).) Moreover, specific to the present action, the internal records of the Toyota Defendants records reveal they should have anticipated the present individual action. (*See* Robinson Decl. Ex. 9 (MDL Docket No. 2389–6) at 199 (noting that the Van Alfen family was represented by counsel).) Thus, this Court has no difficulty concluding that the Toyota Defendants had an affirmative duty to preserve any evidence that could be extracted from an inspection of the Van Alfen vehicle.

## IV. *Motions to Strike and/or Exclude Plaintiffs' Expert Declarations*

The Toyota Defendants move to exclude Plaintiffs' Expert Declarations.

Toyota challenges both Mahon Declarations and the Caruso Declaration as unreliable, relying on *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590–91, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Daubert* imposes upon a trial court the gate-keeping role that is meant to ensure that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597, 113 S.Ct. 2786.

Expert testimony is admissible if the party offering such evidence shows that the testimony is both reliable and relevant. Fed. R.Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert*, 509 U.S. at 590–91, 113 S.Ct. 2786.

Federal Rule of Evidence 702 permits expert testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliability applied the principles and methods to the facts of the case." Fed. R.Evid. 702. A expert can be qualified "by knowledge, skill, experience, training, or education." *Id.*

■ A trial court has a "gatekeeping" obligation to admit expert testimony only when it is both reliable and relevant. *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786; *Kumho Tire Co.*, 526 U.S. at 147–149, 119 S.Ct. 1167. "In *Daubert*, the Supreme Court gave a non-exhaustive list of factors for determining whether scientific testimony is sufficiently reliable to be admitted into evidence, including: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community." *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir.2002). The Supreme Court later held that "a trial court *may* consider one or more" of the *Daubert* factors in determining the reliability of nonscientific expert testimony. *Kumho Tire Co.*, 526 U.S. at 141, 119 S.Ct. 1167 (emphasis in original). Further, the court has "broad latitude" to decide how to determine the reliability of the testimony and whether the testimony is in fact reliable. *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1064 (9th Cir.2002); *see Kumho Tire Co.*, 526 U.S. at 141, 119 S.Ct. 1167. The "test of reliability is flexible, and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.* (internal citations omitted).

For example, in *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir.2000), the Ninth Circuit *Daubert* factors were inapplicable in determining the reliability of a gang expert's testimony because, in that case, "reliability depend[ed] heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." The *Daubert* factors, with their focus on peer review, publication, and the testability of methodologies, were simply inapplicable in that field of expertise. *Id.* Similarly, a surgeon's experience with prosthetic elbow replacements rendered him "qualified by knowledge, skill, experience, training, or education," to render an opinion based on the expected minimum lifespan of an implanted prosthetic elbow in a

products liability case. *Primiano v. Cook,* 598 F.3d 558, 567 (9th Cir.2010).

Although Toyota raises objections to many more paragraphs of the Caruso Declaration submitted with the Reply (MDL Docket Nos. 2331–6 & 2499), the heart of the Caruso Declaration addresses the feasibility of alteration of EDR data through the use of passwords specifically designed to result in such alteration. (*Id.* ¶¶ 27–35.) Toyota contends that Caruso's opinion on this testimony is not based on scientific method or reasoning, is speculative, and does not assist the trier of fact. (*See generally* Evidentiary Objections and Motion to Strike Declaration of Chris Caruso (MDL Docket No. 2348) at 5–8.)

Toyota also objects to the Mahon Declarations. (MDL Docket Nos. 2313 & 2500.) The thrust of Mahon's Declarations is similar to that of Caruso's: That certain actions during the EDR readout cast doubt on its accuracy. Mahon advances a different point, however, in that he opines that by removing the EDR from the vehicle, it would easier to alter the data. He also testifies regarding the usual practice of litigation of having all parties present when the EDR is not returned to the vehicle for inspection.

As their Declarations and *curricula vitae* indicate, both experts are clearly qualified by virtue of their knowledge and experience. (*See* Supp'l Mahon Decl. (MDL Docket No. 2331–2 to –3) ¶ 4 & Ex. A; Caruso Decl. (MDL Docket No. 2331–6) ¶¶ 3–16.) [18]

■ Toyota objects based on the speculative nature of the experts' testimony, *i.e.,* that they have opined as to what could possibly happen rather than what actually did happen. However, the underlying basis of the present Motion is that Plaintiffs were not afforded the opportunity to observe and object to what actually occurred during the November 19, 2010 inspection of the Van Alfen vehicle. Having stated the bases for their opinions, and having acknowledged those opinions concern only the *possibility* for tampering with or altering the EDR data rather than any *actual* alteration of the data,

the Court finds their opinions sufficiently reliable. The possible became relevant when Toyota foreclosed the Plaintiffs' opportunity to participate in the actual inspection.

The Court rejects the contention that the experts' opinions are not helpful. "The requirement that the opinion testimony 'assist the trier of fact' goes primarily to relevance." *Primiano,* 598 F.3d at 564. Toyota's objections go to weight not admissibility.

## V. *Sanctions*

### A. *Standards for Imposing Sanctions For Evidence Destruction or Alteration*

■ A court may sanction a party who despoils evidence on either of two bases: "the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37 against a party who 'fails to obey an order to provide or permit discovery.'" *Leon v. IDX Sys. Corp.,* 464 F.3d 951, 958 (9th Cir.2006) (quoting Fed.R.Civ.P. 37(b)(2)).

■ Generally, three types of non-monetary sanctions may be imposed. First, and least severely, the Court, at trial, may instruct the jury that based on a party's destruction of evidence, it may draw an inference adverse to that party. *Glover v. BIC Corp.,* 6 F.3d 1318, 1329 (9th Cir.1993). The giving of such an instruction is justified for its deterrent effect. *Akiona v. United States,* 938 F.2d 158, 161 (9th Cir.1991). This type of sanction need not be supported by a finding of bad faith; instead, "simple notice of [the despoiled evidence's] 'potential relevance to the litigation'" will support its imposition. *Glover,* 6 F.3d at 1329.

■ Second, a court can exclude witness testimony proffered by the party responsible for destroying the evidence and based on the destroyed evidence. *Id.* This sanction is justified because where evidence has been tampered with in a manner in which it cannot be restored to its original state, the evidence is

---

18. Plaintiffs are directed to make the *curriculum vitae* of Chris Caruso part of the record in this MDL and individual action. This document was purportedly attached to (but apparently inadvertently omitted from) the Caruso Declaration.

no longer authentic as required by Federal Rule of Evidence 901(a), nor is it relevant under Rule 401. *Glover*, 6 F.3d at 1329.

Finally, and most severely, a court may dismiss the claim of the party responsible for destroying the evidence or, where the accused party is a defendant, enter default judgment as to a claim or claims. This ultimate sanction may be imposed only when spoliation is "due to willfulness, bad faith, or fault," and results in unfair prejudice to the opposing party that no lesser sanction can remedy. *In re Exxon Valdez*, 102 F.3d at 432–33. "A party's destruction of evidence qualifies as willful spoliation if the party has some notice that the documents were potentially relevant to the litigation before they were destroyed." *Leon*, 464 F.3d at 959 (internal quotation marks and citation omitted).

In deciding whether to enter default judgment as a sanction, the Court must weigh a number of factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Anheuser–Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir.1995). Moreover, to satisfy due process, a relationship must exist between the sanctioned party's misconduct and the matters in controversy such that the sanctionable transgression "threaten[s] to interfere with the rightful decision of the case." *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 591 (9th Cir.1983).

### B. *Bases for Imposing Sanctions in this Case*

The issue of consent—and whether it was required (as a matter of law) or whether it was actually obtained (as a issue of fact)—is

intertwined with the duty to preserve evidence.

Here, the Court finds that the Toyota representatives who actually performed the EDR download and inspection subjectively believed that they had the owners' consent to perform the download and inspection by virtue of the representations made to them by Smart Team leader Tony Minyon. However, the Court notes that the evidence regarding actual consent lacks any cohesiveness. Minyon's account is that he learned from someone at NHTSA's Office of Defect Investigations ("ODI") that NHTSA's contractor, Jim Perry, had learned from UHP Trooper Miller that Trooper Miller "had secured verbal consent from the vehicle owners." (Minyon Decl. ¶ 7.) Under this account, (1) an unidentified "vehicle owner" (presumably a Van Alfen family member) gave consent to Trooper Miller; (2) Trooper Miller then relayed that information to Jim Perry, NHTSA's contractor; (3) Jim Perry then told an unidentified employee of NHTSA's ODI this information; and (4) and Minyon learned from this unidentified ODI officer that "verbal consent from the vehicle owners" had been "secured." (*See id.*)

However, tracing back this chain of communications to the original sources, the first two links quickly fall apart. First, the only evidence of record of any possible "vehicle owner" giving consent is the testimony of Travis Van Alfen, who is Paul and Shirlene's son and Cameron's brother. He states he did not give consent to the vehicle inspection.[19] (Travis Van Alfen Decl. (MDL Docket No. 2244-2) ¶ 6.) Second, both Trooper Miller and Sgt. Croft deny they obtained consent from the vehicle owner or from any member of the Van Alfen family.[20] (Miller Decl. ¶ 3; Croft Depo. at 101.) Although Perry notes in the DSI report that consent had been secured from the local law enforce-

---

19. The Court acknowledges that the deposition testimony of Travis Van Alfen on this issue reveals that he does not recall his conversations with the UHP officers with great clarity and that his testimony lacks cohesiveness. (*See generally* Sur–Reply (MDL Docket No. 2503) at 10–12 (analyzing details of conversations).) Nevertheless, his testimony is consistent with the testimony of the UHP officers, which is not lacking in clarity.

20. As Toyota counsel pointed out at the hearing on this matter, Trooper Miller states that Sgt. Croft obtained consent. (Miller Depo. at 147 & 162.) However, Sgt. Croft's testimony on this issue is not equivocal, and it is more reliable than another's account of what Sgt. Croft did or did not do. (*See* Croft Depo. at 101.)

ment agency, which is generally consistent with Minyon's account, this is of little value given the denial by both sides (Travis Van Alfen and the UHP officers) to the original source of the supposed consent. (*See* DSI Report at 1.)

Thus, on the present record, the Court finds that although the Toyota technicians who performed the actual download and inspection believed that they had consent, Toyota did not have actual consent from the vehicle owner or any Van Alfen family member.

Nevertheless, the present issue here is only tangentially related to consent.[21] The paramount issue is how Toyota conducted itself in this instance with respect to the largely unpoliced duty of litigants[22]—and their counsel—to preserve evidence relevant to litigation. The relevance of the Van Alfen vehicle—an allegedly defective vehicle—is manifest. Indeed, on the issue of liability, other than eyewitness testimony and the on-scene analysis by the UHP, virtually the *only* evidence of relevance in the present individual case is the vehicle itself. This point is underscored by the fact that no fewer than *nineteen* experts attended the April 17, 2012, inspection of the Van Alfen vehicle. (*See* Motion re Inspection of Van Alfen Vehicle (MDL Docket No. 2536) at 3.)

It is clear that Toyota understood it was in a pre-litigation phase when it inspected the Van Alfen vehicle. It is equally clear that Toyota understood that the Van Alfen family

was represented by counsel. No one disputes that Toyota's lawyer was present for the inspection or that Toyota's technicians and engineers conducted the inspection, although Toyota makes the point that the NHTSA download of the EDR preceded its download. Likewise, there is no controversy regarding the absence of Plaintiffs' lawyers or experts. They were simply not given the opportunity the be present. These facts alone cast a cloud of suspicion over the November 19, 2010 inspection.

Moreover, the acknowledged limitations of the reliability of the EDR data as downloaded by Toyota's ROT, however slight, was such that it also imposed a duty on Toyota counsel to provide counsel for Plaintiffs the opportunity to participate in and/or observe the inspection of the Van Alfen vehicle.

Recently, this Court declined to seal most of the filings related to the present Motion in light of the "recognized . . . common law right of access by the public to court records." (*See* MDL Docket No. 2333 at 3.) The Court noted that "[t]his right is founded on the notion that a government should be subject to oversight by its citizens." (*Id.*) By the same token, our system of civil litigation involves the zealous advocacy by capable counsel, and as such, that system is founded at least in part on the checks and balances opposing counsel place on one another in the course of litigation. As to the November 19, 2010 Van Alfen vehicle inspection, this foundation was wholly lacking.

---

**21.** The Court expresses no opinion whether consent was required under controlling law.

**22.** The Court intended no irony in referring to this duty as "largely unpoliced" when the inspection literally took place in the presence of a number of law enforcement officers. (*Cf.* Tr. at 11 (statement of Toyota counsel disputing the notion that there was "an unpoliced inspection").) The Court's observation was intended in a less literal sense. Specifically, the Court observes that our system of civil litigation imposes many duties on litigants and their counsel that are as a practical matter unsupervised. By way of example, in addition to the duty to preserve evidence, these include a party's required initial disclosures, the identification of documents and materials that are responsive to discovery requests, the withholding of privileged materials, and the preparation of privilege logs. It is in this

manner that the duty to preserve evidence is generally "unpoliced."

As to the actual presence of those law enforcement officers, the Court concludes that the presence of NHTSA and the UHP did not lessen Toyota's duty to afford the Plaintiffs or their counsel the opportunity to be present. Toyota's duty arises as a consequence of and is defined by its status as a party to the present litigation. That neither NHTSA nor the UHP objected to Toyota's participation in the inspection, or even that these agencies actively sought or welcomed Toyota's presence and participation, does not alter the Court's analysis. By the same token, if, according to their governmental authority or agency mission, differing standards of conduct apply to NHTSA's or to the UHP's actions in inspecting the Van Alfen vehicle, that conclusion likewise does not alter the Court's analysis regarding Toyota's actions.

Against this background, the question before the Court is whether to impose sanctions on the basis of this conduct. As the Court sees it, there are essentially two overarching issues implicated by the present Motion. The first is the integrity of the EDR data. The second is the piece of broken plastic found in the throttle body.[23]

### 1. *EDR Data*

As the Court has found, when Toyota downloaded the data from the Van Alfen EDR, Toyota did not have the consent of the vehicle's owner, or that of his surviving family members. Examination of the Van Alfen vehicle, including the downloading of data from its EDR nevertheless proceeded, in the presence of Toyota's counsel and in the absence of counsel for any Van Alfen family member.

The primary issue is whether that EDR data was subject to alteration or destruction by the use of Toyota's proprietary ROT. The Court credits the Mahon testimony and finds that the EDR is more susceptible to corruption or alteration when its data is analyzed outside the vehicle rather than attached to it. However, because the UHP removed the EDR from the vehicle before Toyota became involved with the Van Alfen vehicle, the fact that the data was downloaded outside the vehicle is not of additional concern.[24] Of course, this fact does tend to drive home the more fundamental point of the failure to provide Plaintiffs' counsel the opportunity to participate in the inspection. Including them would have provided Plaintiffs' experts an opportunity to make this point at a time when a request to reattach it to the vehicle could have been addressed.

The Court also credits the Caruso opinion and finds that alteration of the data contained in the EDR is theoretically possible through the use of passwords that execute a program that is intentionally and specifically designed to do so. Terminating sanctions would be justified if Plaintiffs had shown that

the EDR data was actually altered in this manner. However, there is absolutely no evidence that any person engaged in such Machiavellian conduct. Of course, Caruso also offers the opinion that such alteration would be untraceable, and could be initiated by a person without knowledge that the password would cause such an alteration. (Caruso Decl. ¶ 32.) However, in the end, on the present record, like the download of the EDR outside of the vehicle, this controversy tends merely to drive home the more fundamental point of the failure to provide Plaintiffs' counsel the opportunity to participate in the inspection.

Thus, in the absence of actual destruction of or alteration of EDR data in this manner, there is no evidence that suggests the degree of "willfulness, bad faith, or fault," that justifies the imposition of terminating sanctions based on the EDR download. *In re Exxon Valdez*, 102 F.3d at 432–33.

Likewise, there is limited evidence that would justify exclusion of the EDR data. Were the Court to conclude that the EDR data was altered in such a way as to render that data irrelevant within the meaning of Federal Rule of Evidence 401 or inauthentic within the meaning of Rule 901(a), the Court would impose this sanction. *See Glover*, 6 F.3d at 1329.

Two issues have arisen from the comparison of the data downloaded by the parties. The first has to do with a difference in the raw hexadecimal data at location 3E through 4D in the EEPROM memory. The Court credits the explanation provided by Nunan in his Supplemental Declaration, and finds that these data are unrelated to the crash data and instead relate to non-crash vehicle identification number ("VIN") data. (*See* Supp'l Nunan Decl. ¶¶ 6–11 & Ex. C.) Because difference in the raw hexadecimal data does not relate to crash data, it does not support the evidentiary sanction sought by Plaintiffs.

---

**23.** The Court notes that the inspection entailed other potentially questionable actions, including removal of the brake caliper and brake shoes on the passenger side of the Van Alfen vehicle. (Clark Decl. ¶ 10.)

**24.** There is no evidence of record that supports counsel's representation at the hearing that Trooper Miller sought by phone and received the assistance of Toyota's Joseph Lane. (*See* Tr. at 5.) Therefore, the Court does not consider it.

The second issue similarly does not support such an evidentiary sanction. Toyota's expert acknowledges a difference in the Delta V reading, or change in velocity reading (*see supra* note 9), between the download by Toyota using its ROT and a later download by Plaintiffs using a commercially available read-out tool. (Nunan Supp'l Decl. ¶ 13.) Specifically, the Toyota ROT read the Delta V as –34.8 mph, while the later download read it as –27 mph. (DSI Report at 9; Tr. at 2 at 39.) Nunan explains this difference as a "scaling issue" that led to an improper calculation by the ROT in converting the hexadecimal data to readable format. (Nunan Supp'l Decl. ¶ 13.) Nunan reports that this scaling issue has been corrected in a later version of Toyota's ROT and is not present in the commercially available read-out tool used by Plaintiffs. (*Id.*) No evidence has been offered that tends to refute Nunan's opinion that the difference in data is attributable to this identified and acknowledged mistaken interpretation by the Toyota ROT (version 1.4.1.1).[25] As such, it provides no basis on which to conclude the EDR data are either irrelevant or inauthentic, and therefore a evidentiary sanction is not warranted.

██ Instead, this acknowledged difference in Delta V readings, and other facts, leads the Court to impose the least severe sanction, which includes fashioning an appropriate jury instruction. This type of sanction is justified for its deterrent effect, and it need not be supported by a finding of bad faith. *Akiona*, 938 F.2d at 161; *Glover*, 6 F.3d at 1329. Specifically, the acknowledged (and explained) difference in the Delta V reading, like the download of EDR data outside the vehicle and the theoretical possibility of the use passwords to alter otherwise presumably unalterable data, tends to drive home the concerns raised by the failure to provide Plaintiffs' counsel the opportunity to participate in the inspection.

Likewise, the acknowledged (and explained) difference in the raw hexadecimal data regarding the VIN, tends to drive home this point as well. Although the Court credited Toyota's expert's explanation of this issue, the Court also credits the testimony of Plaintiff's expert Caruso, which pointed out that the difference in the raw data—as opposed to a mere difference in the conversion of that data to readable format—tends to suggest that it is incorrect to say (as Toyota has) that the EEPROM cannot ever be overwritten. (*See* Caruso Depo. at 47 & 149.)

Individually, and certainly collectively, these facts support imposition of some form of sanction. Accordingly, on these facts, and on the present record, the Court concludes that the Toyota's failure to give Plaintiffs' counsel the opportunity to attend the November 19, 2010 inspection, especially when coupled with the acknowledged doubt as to the reliability of the Toyota ROT, warrants some type of cautionary instruction to the jury.

In this instance, at trial, the Court will formulate an appropriate adverse inference instruction. Although the Court has not determined the nature or language of the adverse inference instruction, the Court has not ruled out the possibility of a shift in the burden of proof as a possible sanction. At a minimum, the Court will give a cautionary instruction similar to the one discussed in the next subsection.

### 2. Broken Piece of Plastic

As a matter of fact finding, the Court determines that a Toyota technician removed a piece of plastic from the throttle valve opening when the vehicle was inspected on November 19, 2010. Having read and watched portions of the Clark deposition, the Court found Clark credible and saw no reason not to treat him as anything other than a

---

25. Nunan also opines, without further explanation, that the Delta V reading represents "post-crash data that has no bearing on the content of the hexadecimal EDR data or the reported pre-crash data." (*Id.*) Without further explanation, this opinion is at odds with the Court's understanding of the Delta V reading (*see supra* note 9), that it indicates a change in velocity, or speed, within a specified time period. Here, with a decrease in speed of approximately 27 to 35 mph in two-tenths of a second, it appears to the Court to represent the collision of the Van Alfen vehicle into the concrete embankment rather than "post-crash data." However, this issue has little impact on the Court's present analysis; therefore, any definitive resolution of this issue is reserved for another day, and likely, another fact-finder.

**504**

disinterested third-party observer. The Court also noted the precision of his testimony, referring to needle-nosed pliers. Further, his testimony is corroborated at least in part by a Highway Patrol officer who was present.

 On the present record, the Court cannot determine whether there is a causal relationship between the plastic piece lodged in the throttle body and the accident, or whether the piece lodged in the opening as a result, not a cause, of the crash. In these circumstances, the Court believes that an evidentiary sanction is appropriate, but a modest one. Accordingly, the Court will instruct the jury:

> You [will hear] [have heard] testimony concerning an inspection of the Van Alfen vehicle on November 19, 2010. There has been testimony concerning whether a piece of plastic was lodged in the throttle body opening, keeping the valve open. You should regard the testimony of the Toyota personnel who were present concerning the inspection of the valve and the condition of the valve with greater caution than that of other witnesses.

The Court will consider any modifications or additions to the instruction in light of the evidence received at trial. To the extent that the evidence at trial, or otherwise, establishes a causal link between the condition of the throttle body valve and the accident, the Court will reevaluate the appropriate level of evidentiary sanctions.

VI. *Conclusion*

As set forth herein, the Court grants in part and denies in part Plaintiffs' Motion for Sanctions. The appropriate jury instructions will be fashioned by the Court, in consultation with the parties, and in light of this Order and the evidence presented at trial.

**IT IS SO ORDERED.**